## ROUNSAVILLE *v.* THE STATE.

1. The evidence authorized the verdict.
2. It can not be held that there was an abuse of discretion on the part of the court below in refusing to grant a new trial on the newly discovered evidence.

No. 5508. OCTOBER 15, 1926.· REFILED JANUARY 10, 1927.

Murder. Before Judge Maddox. Chattooga superior court. June 3, 1926.

*J. M. Bellah,* for plaintiff in error.

*George M. Napier, attorney-general, J. F. Kelly, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra. .

---

Criminal Law, 16 C. J. p. 1180, n. 74; p. 1182, n. 88; p. 1187, n. 52, 53; p. 1191, n. 7; p. 1193, n. 11, 12; p. 1195, n. 29.

BECK, P. J.   The grand jury for the county of Chattooga, at the March term, 1926, of the superior court of that county, returned an indictment charging John Rounsaville, the plaintiff in error, with the offense of murder, for that, as it is charged, he on the 22d day of September, 1925, did wilfully and feloniously kill and murder George Rounsaville, by striking with his fist the head and breaking the neck of the decedent.   On the 29th day of March, 1926, the case came on for trial, the accused having filed a plea of not guilty.   The jury trying the case returned a verdict of guilty, without recommendation; and the sentence of the court was that the convicted man be executed according to law. A motion for a new trial was made by the plaintiff in error containing the usual general grounds, and this motion was afterwards amended.   Upon the hearing the court overruled the motion, and the movant excepted.

The child alleged to have been murdered by the defendant was an infant some six or seven or eight months old.   The defendant was the child's stepfather.   The body of the child was buried the next morning after it was killed.   Will Housch, a colored man called by the State as a witness, testified: "The child was buried the next morning after it was killed, according to the time they said it was done—the news came to us at church; it was the next morning, he [the accused] came for me to dig the grave next morning.   It was buried next morning.   He came and asked me to help dig the grave; and I says, 'I have been under the weather, don't feel good.'   He said he wanted to get it buried before ten o'clock, and I says, 'Why hurry so?' and he says, 'There's no use keeping it here; it will do no good to keep it here,' and I says to him, 'If you want to bury it by ten o'clock you had better get some help, for we can't get ready by ten o'clock if you don't.'   He seemed to be in a hurry to get it buried."

Luther Hale testified as a witness for the State, that he sold an infant casket to John Rounsaville; that the latter came to see about the coffin at about 6:30, saying his baby had died the night before, and that he wanted a casket for it, and that he wanted to get it buried by ten o'clock; that the child had died of the "hives."

Martha Farmer, a colored woman called as a witness for the State, testified: "I knew the defendant, John Rounsaville.   I knew this little child of his while it was living.   It was about six

or eight months old. Yes, I have heard the defendant say things about this child. He would come in and take the baby, and it would keep crying, and he was sitting on one end of the porch with it, and I was on the other end, and he said to it, 'I wish you were dead.'"

Fred Hall, a medical doctor of seventeen years experience, testified that he had known the defendant for ten years; that he made a post mortem examination of the decedent sometime in September, 1925; that he found a dislocation of the neck and a fracture of all the cranial bones on the left side of the head, just above the ear; that this might have been done by a man with his fist striking a child of that size. It was also found that the neck of the child was dislocated. This witness further testified that he had a conversation with the defendant, and that the accused admitted striking the child. "He said it was lying on the bed, and that he hit it three or four licks with his fist on the side of the head and held it on the bed, and caught hold of its head and twisted its neck and head, and in that way he said he killed it."

1. The above statement contains a summary of all the evidence introduced on the trial. The defendant called no witness, nor did he make a statement. It is manifest there is no merit in the general grounds contained in the original motion for a new trial. The evidence authorized the verdict. The proof of the homicide was uncontroverted, except by the plea of not guilty, and the jury were authorized to find that motive had been shown for the killing. This is referred to especially as in one of the grounds of the amendment to the motion it is insisted that no motive for the crime was shown.

2. In other grounds of the amendment to the motion it is insisted that the evidence alleged to be newly discovered was of such a character as to require the grant of a new trial. That newly discovered evidence is contained in the affidavits of Fred Hall, M.D., J. D. Taylor, S. M. Ferguson, J. W. Rounsaville and Lucinda Rounsaville, J. M. Bellah, John Rounsaville, and H. D. Brown, M.D.

Dr. Fred Hall deposed as follows: "In regard to the defendant, John Rounsaville, I have known him for eight or ten years. He has been my employee for the last ten years; has done the work in my office as an office boy, cleaning and doing such drudgery

as an office boy, and for this time has also been engaged about my home in the affairs of the household drudgery. I also used him in driving my car as I visited my patients. I had in this way an opportunity to know him, observe his conduct and character. John Rounsaville at times is not a normal man. On the day on which the killing of the child occurred at night he was at his duty and left my home after dark. John was subject to periodical spells that lasted him from 20 to 24 hours. When these spells were on him, and they grew on him by degrees, he was morose, ill; in fact, he was not responsible for his conduct, and at those particular times I could not trust him at anything by himself. As stated, these spells came periodically, and at such times he could not control himself. These morose spells as coming periodically upon him I have thoroughly studied, which placed him beyond control of himself; speaking from a medical standpoint, came from, and was due to, excessive venery. This theory is based on what I know of his conduct and the medical research I made. I have learned that when these copulative desires come upon him and he could not have access to a female, he could not resist resorting to a beast, and when I have reprimanded him about such conduct he said that while these spells lasted he had no control upon himself in any way, and had no control in any regard of himself while this condition of his mind and spell was upon him. I have reprimanded him and told him such a vice was not only inhuman and shameful, but a great crime under the law, and he said he had no control upon himself on these occasions. The afternoon of the day on which the child was killed he was at my office and with me that day, and one of these spells was coming on him; during the day he was sulky, disobedient and resentful, and grew worse as night approached. He left to go to his home that evening; it was after dark; one of these periodical spells was on him. He had had these spells so often that I could tell when they were approaching, and they usually lasted from 12 to 24 hours. While engaged in wiping some of my surgical instruments he jerked one of my costly instruments in cleaning it and broke it. He seemed to have no mind or sense as these spells grew upon him, and was not trustworthy for anything, and I had him to quit. I testified for the State in the trial of this case, but I had not advised any one of information contained in this affidavit. I do

not believe that this negro knew what he was doing when he committed this act, and that it was done while under the influence of his affliction. This is just my opinion as to what I know from the study of my profession about the action of the human mind and the facts that I know about this particular defendant, which I have not heretofore divulged to anybody."

John D. Taylor made an affidavit in which he deposed in part that he had never regarded the defendant as a boy having very much intellect. "I was present at a preliminary hearing a day or so after the alleged crime, and during a part of the trial, and at the time he was sentenced, and at neither of these trials did he appear to me to realize what was actually taking place, or the gravity or danger of the situation in which he was placed. When he was sentenced he seemed to be less moved than any one else present. From my observation on this occasion, and from what I have seen of him periodically during his life, I do not believe that he is altogether a normal person."

S. M. Ferguson, a minister in charge of a church for colored people, made an affidavit in which he deposed in part that he knew the habits and the conduct of the defendant as he was growing into manhood; that he had "periodical spells," which usually lasted him from about 36 hours to two days, and he seemed to have no control of himself during these spells; that he was violent, and had no knowledge of right and wrong. These spells had lasted up to the present time. That he did not communicate this evidence to counsel for the accused until after the trial.

J. W. Rounsaville and Lucinda Rounsaville, the father and mother of the movant, in an affidavit made by them, deposed in part as follows: "We never saw any mistreatment or ill feeling exhibited by him [the movant] towards this child, which was not his child but the child of his wife. . . John Rounsaville from childhood had been subject to spells of melancholy and despondency and in these spells, which were periodical, he had no control over himself. He would fly into a passion and act like a mad man and was not accountable for what he did while these spells were on him. They would last sometimes from 24 to 36 hours. . . We did not impart this information to J. M. Bellah, attorney, regarding these periodical spells and the effect they had on his conduct, at and prior to the trial of the case."

J. M. Bellah, who was appointed by the court as counsel for the movant, states in his affidavit: "I was appointed on the day before the calling of the case at the opening of the court next morning, and I had no knowledge of the facts set up in the foregoing affidavits as to the mentality of the defendant in this case. Not until after the trial did this information and knowledge come to me, and I could not have discovered the same by more due diligence than was given the case before the trial."

John Rounsaville, the movant, in an affidavit made by him deposed that he had no knowledge of the facts set out in the foregoing affidavits, and did not know prior to the hearing that he could prove the facts set forth in those affidavits, nor did he receive knowledge of them prior to the trial. That he was confined in jail, unable to employ counsel, and his case was tried without his attorney being prepared for the same.

H. D. Brown made an affidavit, in which he deposed that the affiants above named, that is Dr. Hall, J. D. Taylor, S. M. Ferguson, are gentlemen of good character and known veracity and worthy of credit. That S. M. Ferguson, a colored minister, is a man of good character and his evidence is entitled to weight "for the best of his class."

Evidence was introduced by the State in rebuttal of the newly discovered evidence reported above. But regardless of that, it can not be said that the court abused its discretion in overruling the ground of the motion based upon the evidence alleged to have been newly discovered. Dr. Fred Hall, who made one of the affidavits, was on the stand at the trial, having been introduced by the State. He was cross-examined by the defendant's counsel, and then testified, in response to questions by the latter, that he had known the defendant eight or ten years; that he was at work for him, the witness, at the time of the child's death; that "his character and conduct up to the time he left me was good. He sent for me to come to the jail to have this talk with him. I don't know why he selected me to make that confession to. In a way he gave a reason, saying he would not tell any one but me, because I knew him and he had been with me for a long while."

We do not think that where a witness has been on the stand, has been cross-examined as to the conduct of the accused by counsel for the latter, it should be held that the court abused its discretion in overruling the motion for a new trial based upon an

affidavit, made subsequently to the trial by such witness, that the accused had "spells" which temporarily rendered him irresponsible for his acts. "Where witnesses summoned by the defendant are present at the trial but are not examined, a new trial will not be granted on the ground that since the verdict the defendant has for the first time learned that they could have testified to facts material to his defense. Civil Code, § 5480." *Hall v. State,* 117 *Ga.* 263 (43 S. E. 718). Other decisions to the same effect are cited under the catchword "Diligence" appended to § 1088 of Park's Ann. Code, vol. 6 (Penal Code). Clearly, the affidavit of J. D. Taylor, wherein he deposed that the accused was not entirely normal, is not good ground for the grant of a new trial, though it is perhaps corroborated to some extent by other affidavits. It is unnecessary to comment upon the other affidavits; they are substantially set forth above. We refer to the cases cited above.

In the first ground of the amended motion counsel for plaintiff in error insists that the evidence for the State did not show a motive for taking the life of the infant child, but that it did show facts connected with the death of the child, "which was so savage, inhuman, and ferocious, that the fact itself marks the perpetrator as one laboring under delusion and not mentally at the time responsible for his acts." From this it appears that it occurred to counsel for the accused that the mental condition of the defendant deserved consideration. If that be true, it would seem that due diligence would have required that upon cross-examination of Dr. Hall, who was a witness on the stand and who testified as to the conduct of the accused, counsel should have interrogated him upon the stand or have ascertained in a conversation with him all that he knew concerning the mental condition of the prisoner. And it would also seem that due diligence would have required that counsel should have made some inquiries of those who had known and had been associates of the accused, to ascertain whether they knew of any facts that would throw light upon the mental condition of the prisoner. It had occurred to counsel that the facts attending the perpetration of the homicide "marked the perpetrator as one laboring under delusion and not mentally at the time responsible for his acts," but it does not appear that counsel made any attempt to discover witnesses who could testify as to whether or not the

accused was mentally sound or not. It is true that counsel had been appointed to defend the prisoner only a short time before the trial came on, as is shown by his affidavit set forth above, but there was no motion for a continuance or for a postponement of the case for such a period as would allow counsel to more fully prepare for the trial.

Wherefore we conclude that this court is not authorized to interfere with the discretion of the court in refusing a new trial upon the ground of newly discovered evidence.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*